THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL A. HETZEL, Defendant-Appellant.

First District (3rd Division)   No. 1—86—3331

Opinion filed March 22, 1989.

Daniel E. Radakovich, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Eileen Rubin, Andrea K. Muchin, and Thomas M. Davy, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE FREEMAN delivered the opinion of the court:

After a bench trial, defendant, Michael A. Hetzel, was convicted of murder and armed violence in connection with the death of a 27-year-old woman in Lyons, Illinois. The trial court sentenced defendant to concurrent terms of imprisonment of 30 years for murder and 15 years for armed violence. Defendant appeals and asserts that the trial court erred in denying his pretrial motion to suppress statements, since defendant was denied his *Miranda* rights, and that the

trial court erred and abused its discretion in quashing a subpoena served on a witness.

For the reasons stated below, we affirm the judgment of the circuit court.

The following evidence was adduced at the hearing on defendant's motion to suppress. Lyons police officer John Flanagan testified that on the morning of May 31, 1986, he and his partner, Lieutenant Donald Kroft, approached defendant, then 16 years old, and his parents, Albert and Patricia Hetzel, at the cemetery where funeral services for the victim were being held. At the request of the officers, defendant and his parents arrived at the police station that day at 12:30 p.m., where they met with Flanagan, Kroft, and juvenile officer Frank Krall. At the officers' request, defendant's parents signed a juvenile release form granting the police permission to speak with defendant outside of the presence of his parents. Flanagan then read *Miranda* warnings to defendant and his parents, all three of whom signed a waiver of *Miranda* rights form. Patricia Hetzel then asked Flanagan if they needed a lawyer. Flanagan responded, "[T]hat's what all of these rights were about," and told the Hetzels that it was at their discretion as to whether they wanted to obtain a lawyer.

The officers then spoke with Patricia Hetzel for 20 to 30 minutes outside the presence of defendant and Albert Hetzel. The officers then spoke with defendant for approximately two hours. During that time, defendant agreed to submit to a polygraph test. The police then spoke with Albert Hetzel, outside the presence of his wife and defendant, for approximately 10 minutes. The officers then told defendant's parents that there were discrepancies in defendant's stories and that defendant had agreed to submit to a polygraph examination.

On June 4, 1986, defendant and his parents again went to the police station at the police's request. Flanagan, Kroft, Krall, defendant and his parents were present in the sergeant's office where a discussion of the polygraph test was conducted. Flanagan read aloud a juvenile release consent form printed by the John Reid Company, which conducts polygraph examinations. Defendant signed the consent form, which his parents, Flanagan, and Kroft witnessed. Defendant's parents signed the form in another place, since defendant was a juvenile, and Flanagan and Kroft also witnessed the parents' signatures. Albert Hetzel requested and was given a copy of the consent form.

On June 5, 1986, at the police's request, defendant and his parents again went to the police station. The Hetzels then followed, in

their own car, Officers Flanagan and Kroft to the John Reid Company in Chicago, where they arrived around 11 a.m. Defendant went with Mark Reid, the polygraph examiner, into an interview room. Defendant's parents remained in the reception room. Flanagan and Kroft went for coffee and returned to the Reid office at noon. Around 12:23 p.m., Mark Reid told Flanagan and Kroft that defendant had failed the polygraph test and confessed to the murder. Reid Company president Joseph Buckley then spoke with the officers. Subsequently, Buckley witnessed defendant's confession with Mark Reid. Reid then told the officers that defendant told Buckley substantially the same story he had told Reid earlier.

Around 1:08 p.m., a formal confession was obtained from defendant in the presence of Mark Reid, a Reid Company secretary, and Flanagan. Prior to taking the statement, Flanagan read defendant his *Miranda* rights from a Reid Company form. Defendant orally waived his rights and also signed a written waiver. There was no lock on the door of the interview room, and defendant was not handcuffed.

Around 2 p.m., Buckley informed Flanagan that defendant had declined an offer of food or drink. Flanagan offered defendant food or drink at 3:30 p.m., and defendant again declined. Around 4:24 p.m., Reid gave defendant *Miranda* rights before handing him a typewritten copy of his confession, prepared by the Reid Company secretary from her shorthand notes taken during defendant's confession. Mark Reid read aloud the statement, in the presence of defendant, the secretary who had prepared the statement, and Flanagan. Defendant looked on his own copy, making corrections where necessary. Defendant then signed each page of the corrected written confession.

The police then told defendant he was under arrest. Flanagan asked defendant if he wanted to speak with his parents, and defendant declined. Around 5 p.m., Flanagan told Albert and Patricia Hetzel that defendant was under arrest. Flanagan admitted that around 4 p.m., defendant's parents had requested to see Lieutenant Kroft. Between 5 and 5:12 p.m., Flanagan again asked defendant if he wanted to see his parents, and defendant again responded that he did not.

The police then drove defendant to the police station. Defendant was not handcuffed. While in the car, Flanagan "verbally reminded" defendant of his *Miranda* rights. From the station, the police ordered a pizza and cola for defendant at defendant's request. Albert and Patricia Hetzel then arrived. Defendant was asked if he wanted

to see his parents, and he stated he did not, since he was eating. Defendant agreed to speak to an assistant State's Attorney, who the police indicated was on his way to the station. Before the State's Attorney arrived, however, an attorney telephoned the station and spoke with defendant. Thereafter, defendant told police his family had hired an attorney and he would not speak further to the police. When the State's Attorney arrived and identified himself to defendant, defendant declined to talk to him. Later, defendant's attorney arrived at the station, spoke with defendant, and left. Defendant was asked by police if he wanted to speak to his parents, and at this point he responded that he did.

Lyons police officer Frank Krall testified that, as a juvenile officer, he was present during the May 31, 1986, interview of defendant to ensure that nothing was "done wrong," since defendant was a juvenile. Krall ensured that defendant was advised of his *Miranda* rights, as an adult would have been.

Mark Reid testified that on June 5, 1986, he interviewed defendant for 20 minutes and then conducted the polygraph examination, which lasted 20 to 25 minutes. Reid did not give defendant *Miranda* warnings prior to or during the polygraph test, and defendant made no admissions during that time. The examination ended around 11:50 a.m. By noon, Reid determined that there were discrepancies in defendant's answers. Reid then went into a second interview room, where defendant had been transferred after the test, and told defendant the results of the test indicated that defendant caused the death of the victim. Reid spoke with defendant for 20 to 25 minutes longer without giving him *Miranda* warnings. During this time, defendant made admissions to Reid regarding his commission of the murder.

Reid further stated that around 12:20 p.m., he told Flanagan and Kroft that defendant confessed to the crime. Reid and Joseph Buckley went to the room where defendant was, and defendant repeated to Buckley what he previously had told Reid. Reid and Buckley then returned to the room where Kroft and Flanagan were and told the officers of their conversation with defendant. It was then determined that a formal statement would be requested of defendant.

During cross-examination and redirect examination, Reid stated that he checked on defendant at least twice between 1:30 and 4:15 p.m., asking defendant if he needed to use the washroom or wanted food or drink, and that defendant declined. Defendant did not ask to see his parents during that time. Once when Reid looked in on him, defendant was asleep. Reid never told defendant he was free to go;

however, defendant never asked to leave. Reid never told defendant that his parents wanted to talk to him.

Lyons police officer Donald Kroft testified to his participation in the investigation. Kroft admitted that no *Miranda* warnings were given to defendant on June 4, 1986, and none were given on June 5, 1986, until 1:08 p.m.

Albert Hetzel testified that on May 31, 1986, when his wife asked Flanagan if they needed a lawyer, Flanagan responded that in his opinion, they would only be wasting their money. Albert Hetzel also stated that he attempted four times to speak to the police while defendant was being interviewed at the Reid Company on June 5, 1986, apparently in an attempt to see defendant. First, at 12:50 p.m., he told the Reid receptionist he wanted to speak to Flanagan. The receptionist stated that Flanagan was in conference and she would get the message to him. Thirty to forty-five minutes later, Hetzel told a receptionist that he wanted to talk to Kroft, whom he had just seen in the hallway. The receptionist looked but did not see Kroft. One to one and one-half hours later, Hetzel told a receptionist he wanted to see Flanagan or Kroft. The receptionist stated that she would get a message to the officers. Finally, one hour later, around 4 p.m., Hetzel told a Reid employee of his desire to see Flanagan. The employee told Hetzel that the interview should be finished in 15 minutes.

Albert Hetzel stated that he did not see defendant at Reid after defendant was interviewed; he saw him next at the police station later that night. On cross-examination, Albert Hetzel stated that between May 31, 1986, and June 4, 1986, he and his wife discussed getting an attorney and were aware that they could get an attorney. They did not bring an attorney to the meeting on June 4, 1986. Patricia Hetzel testified and stated, as did her husband, that on May 31, 1986, Flanagan had responded to her question of whether they needed an attorney, that they would only be wasting their money.

At the close of the hearing, the trial court denied defendant's motion to suppress. The court noted that defendant and his parents were given *Miranda* warnings on May 31, 1986, and indicated they understood their rights. Further, the court found that defendant's mother knew she was entitled to an attorney, despite the alleged comment by Officer Flanagan that retaining counsel would be a "waste of money." The court found that there was no custody until after defendant made admissions regarding the murder. The court concluded that defendant's statements were voluntarily and intelligently made.

At trial, the victim's parents and spouse testified, in addition to the investigating police officers. Defendant's confession was read into the record through the testimony of Officer Flanagan. The statement indicated that defendant killed the 27-year-old victim by stabbing her. Defendant had gone to the home of the victim, who lived next door to him, to return videocassette tapes he had borrowed from the victim and her husband. The victim knelt down to place the returned tapes under the television set. As she attempted to get up, she fell back and her hand grabbed onto the inner part of defendant's left leg. She stated she was sorry and was sure that no one would ever do that to defendant. Defendant stated that her words hurt his feelings, and he thought she meant he was not attractive. He took a knife that he carried in his pocket and stabbed the victim to death.

Defendant testified at trial and asserted that the victim had grabbed his penis. Defendant testified that when she stated she was sure no one would ever do that to him, he was thinking about an incident which had occurred when he was in first grade, when a teacher used to fondle him when she helped him get ready to go home.

At the close of trial the court found defendant guilty of murder and armed violence. At the sentencing hearing, the defense called Dr. Gaspero, a clinical psychologist who testified to his belief that the actions of defendant toward the victim came as a "rage reaction" as revenge on the teacher who had sexually abused defendant when he was in first grade.

On appeal defendant initially contends that the trial court erred in denying his motion to suppress statements. Defendant asserts that under the "totality of the circumstances," his confession was not voluntarily given. Defendant asserts that Mark Reid acted as an agent of the police in questioning defendant on June 5, 1986, and that Reid improperly questioned defendant without giving him *Miranda* warnings. Defendant also contends he was denied his *Miranda* rights when he spoke with Reid president Buckley after confessing to Mark Reid. Further, the police were told of defendant's statements before defendant was given *Miranda* warnings. In addition, defendant asserts that during the interview with Reid, he was never advised that he was free to leave or that he could request that the polygraph examination be stopped. Further, defendant was kept separated from his parents once the interview began.

■■ In *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, the United States Supreme Court held that a

defendant must be advised of his constitutional rights to remain silent and to an attorney when he is subject to custodial interrogation. The Court defines "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612.

In *Oregon v. Mathiason* (1977), 429 U.S. 492, 50 L. Ed. 2d 714, 97 S. Ct. 711, the Court stated, *"Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." (Emphasis in original.) *(Mathiason,* 429 U.S. at 495, 50 L. Ed. 2d at 719, 97 S. Ct. at 714.) In *Mathiason,* the Court held that *Miranda* warnings were not required where the defendant voluntarily agreed to meet a police officer at the State patrol office to discuss a burglary. The defendant was questioned by the officer in a room with the door closed and admitted to the burglary after brief questioning.

Further amplification of the principles set forth in *Miranda* and *Mathiason* was given by the Supreme Court in *California v. Beheler* (1983), 463 U.S. 1121, 77 L. Ed. 2d 1275, 103 S. Ct. 3517, where the Court found that the defendant's constitutional rights were not violated where the defendant voluntarily agreed to accompany the police to the station and where the police specifically told the defendant that he was not under arrest. While at the station, the defendant voluntarily spoke with the police regarding a murder, and no *Miranda* warnings were given. The questioning lasted 30 minutes, after which time the defendant was told his statement would be evaluated by the District Attorney, and the defendant was free to go home. The defendant was arrested five days later and advised of his *Miranda* rights. He then gave a taped confession in which he admitted that his first statement to the police was voluntarily given. The Court reiterated the constitutional requirements set forth in *Miranda,* and explained that, as set forth in *Mathiason,* "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Beheler,* 463 U.S. at 1125, 77 L. Ed. 2d at 1279, 103 S. Ct. at 3520, quoting *Mathiason,* 429 U.S. at 495, 50 L. Ed. 2d at 719,

97 S. Ct. at 714.

■■ ■ In the instant case, we must determine whether defendant was subject to custodial interrogation prior to receiving *Miranda* warnings, that is, during his interview and testing by the Reid Company employees prior to the time that a formal statement was taken in the presence of the police. Defendant asserts that the Reid employees served as agents of the police in questioning defendant, and therefore, defendant was entitled to his *Miranda* warnings before being questioned by them. The threshold question, however, is whether defendant was in custody while being questioned by the Reid employees. The trial court's denial of the motion to suppress defendant's statements cannot be reversed unless contrary to the manifest weight of the evidence. *People v. Argo* (1985), 133 Ill. App. 3d 421, 478 N.E.2d 873.

The Illinois Supreme Court, in *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870, addressed the question of whether a defendant was subject to custodial interrogation, applying the standards set forth in *Miranda*. The court found that the defendant, a high school student, was not in custody under *Miranda* where he was not under arrest and voluntarily went to the police station, where he voluntarily answered questions of the police. The court found the evidence showed that "regardless of defendant's subjective beliefs, he was not, and would not have been, forbidden to leave." *Wipfler,* 68 Ill. 2d at 170.

In view of *Wipfler* and based upon the standards set forth by *Miranda* and its progeny, we find that defendant in the instant case was not in custody when he gave his statements to Reid and Buckley. Defendant's freedom of movement was not restricted to such a degree as it would be if he were under arrest or otherwise subject to police coercion as contemplated by *Miranda*. Defendant was asked, after receiving *Miranda* warnings on May 31, 1986, whether he would be willing to submit to a polygraph examination, and he stated that he would. The police also told defendant's parents on that day that defendant had agreed to submit to a polygraph examination. Several days later, defendant and his parents agreed to go to the police station and, while there, voluntarily signed a consent to a polygraph examination form.

Defendant and his parents voluntarily went to the police station again the next day, June 5, 1986, and then proceeded to the polygraph examiner's office, traveling in their own automobile, while the police arrived there in a police vehicle. Once at the private office, defendant met the polygraph examiner and went into an interview

room with him. Defendant's parents remained, throughout the interview, in the reception room of the examiner's office. The police left the office for a short time and then returned and waited in a separate room within the office area. Defendant was not handcuffed or otherwise physically restrained. Officer Flanagan testified that there were no locks on the door of the interview room.

Albert Hetzel testified that he attempted to see his son, by asking to speak to the police officers, his first attempt occurring around 12:50 p.m. Further, defendant was not told that his parents wanted to see him. Defendant, however, never asked to leave the room, nor did he request to see his parents. Officer Kroft testified that defendant was free to leave the Reid office after speaking to Reid and Buckley. Officer Flanagan also stated that defendant was free to leave the Reid office after he spoke with Reid and Buckley, although Flanagan later testified that if defendant had requested to leave some time after 12:23 p.m., Flanagan possibly would not have let him leave.

Under these circumstances, we find that defendant was not in custody, and therefore, *Miranda* warnings were not required prior to the time the police were present to take a formal statement from defendant. The trial court's denial of defendant's motion to suppress is supported by the manifest weight of the evidence.

Defendant cites *People v. Baugh* (1974), 19 Ill. App. 3d 448, 311 N.E.2d 607, *cert. denied* (1975), 421 U.S. 920, 43 L. Ed. 2d 789, 95 S. Ct. 1587, in which the court found that statements by the defendant given at the victim's home in response to questions by the victim's attorney were improper products of custodial interrogation, obtained before *Miranda* warnings were given. (*Baugh,* 19 Ill. App. 3d at 450-51.) First, the court found that the defendant was in custody as defined in *Miranda* since the defendant was under arrest and police officers were present at the questioning. Further, the court found that the defendant had been subjected to questions which constituted interrogation initiated by law enforcement officers, as set forth in *Miranda.* The court stated that counsel for the victim "acted as a police instrumentality" in questioning the defendant while he was under arrest. (*Baugh,* 19 Ill. App. 3d at 450-51.) Defendant also cites *People v. Turner* (1973), 56 Ill. 2d 201, 206-07, 306 N.E.2d 27, in which the supreme court referred to a polygraph examiner as an "agent of the police" where the examiner, aware that the defendant was mentally retarded, continued to question him after he requested an attorney.

In both *Baugh* and *Turner,* the issue for the courts' determina-

tion was whether the statements of the defendants were voluntarily given. In both cases, the courts found that the defendants were "in custody" under *Miranda* and therefore were entitled to full *Miranda* warnings before being questioned. In the instant case, however, we need not address the issue of the waiver of *Miranda* rights or the voluntariness of defendant's confession, since we have found that defendant was not in custody and therefore not subject to *Miranda*.

■■ ■ Defendant also contends that the trial court erred and abused its discretion in quashing a subpoena upon one of defendant's former teachers. At the hearing on the motion of an attorney representing the school district where the teacher was employed, defendant's attorney made an offer of proof regarding the relevance of producing the teacher in the instant case. Counsel stated that the victim's actions and words reminded defendant of his being fondled by a teacher in first grade. Counsel admitted that defendant was unsure which teacher was involved, and that it might have been defendant's regular first grade teacher or a special education teacher or one who sometimes helped the regular teacher. Defense counsel stated his desire to call one of the first grade teachers to allow defendant to view her in order to determine if she was the one who had fondled him. If defendant made a positive identification, counsel would seek leave to call the woman as a witness. The trial court granted the motion to quash the subpoena, stating that it would not subject the woman to a violation of her reputation, and further, that whether defendant could identify the woman was not relevant. Defendant contends that the trial court's denial of an opportunity for defendant to view the witness violated defendant's sixth amendment right to have compulsory process for obtaining a witness in his favor.

The United States Supreme Court in *Washington v. Texas* (1967), 388 U.S. 14, 18 L. Ed. 2d 1019, 87 S. Ct. 1920, stated that the sixth amendment right to compulsory process and fundamental fairness at a criminal trial is violated where a defendant is denied the opportunity "to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." (*Washington v. Texas*, 388 U.S. at 23, 18 L. Ed. 2d at 1025, 87 S. Ct. at 1925; see also *Roviaro v. United States* (1957), 353 U.S. 53, 63-64, 1 L. Ed. 2d 639, 646-47, 77 S. Ct. 623, 629-30.) The court for the Seventh Circuit stated subsequently, "[u]nless the witness denied to the defendant could have produced relevant and material testimony for his defense, there is no constitutional violation." (*United States v. De Stefano* (7th Cir. 1973), 476 F.2d 324, 330.) This court

also has stated that a trial court need not issue compulsory process upon a person who is not a material witness in the case. *People v. Levinson* (1979), 75 Ill. App. 3d 429, 394 N.E.2d 509, *cert. denied* (1980), 449 U.S. 992, 66 L. Ed. 2d 288, 101 S. Ct. 527; *People v. Savaiano* (1973), 10 Ill. App. 3d 666, 669, 294 N.E.2d 740, 742-43.

We find no constitutional violation, error, or abuse of discretion by the trial court's quashing of defendant's subpoena to produce and call to the stand defendant's former teacher in the instant case. Defense counsel admitted that he was not certain that the teacher sought to be subpoenaed was the person involved in the alleged incident while defendant was in first grade. Further, counsel's offer of proof failed to indicate that the witness' testimony would be relevant and material to the defense. Counsel stated that her testimony could corroborate the opinion of the psychologist, that defendant's actions were triggered by the incident with the teacher in first grade. Defense counsel argued that defendant's identifying the teacher was relevant to the defense regarding mitigation.

Under these circumstances, we find that the trial court properly held that defendant would be allowed to testify as to the incident in first grade, but that he would not be allowed to testify that the woman involved was or might have been the teacher defense counsel sought to subpoena. Defendant's identification of the teacher was not relevant to the defense. If the defense theory of the case was to focus on the mental state of defendant when he did the acts causing the death of the victim in the instant case, then defendant's own testimony regarding his state of mind and the testimony of the psychologist who interviewed him would be relevant and material. However, we cannot find that an identification of the teacher by defendant or the testimony of the teacher would be relevant or material to the instant case. Further, as noted by the trial court, the potential harm to the teacher, were such an identification and testimony allowed, would be great.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

RIZZI and WHITE, JJ., concur.