Filed 9/30/08          NO. 4-05-1016

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
|       Plaintiff-Appellant, | ) | Circuit Court of |
|       v. | ) | McLean County |
| LONA R. GRIFFIN, | ) | No. 01CF90 |
|       Defendant-Appellee. | ) | |
| | ) | Honorable |
| | ) | Scott Drazewski, |
| | ) | Judge Presiding. |

_____

JUSTICE STEIGMANN delivered the opinion of the court:

In June 2001, a jury convicted defendant, Lona R. Griffin, of first degree murder of her infant son, Joseph. The trial court later sentenced her to 25 years in prison. On appeal, this court reversed defendant's conviction and remanded for further proceedings. People v. Griffin, 351 Ill. App. 3d 838, 856, 815 N.E.2d 52, 66 (2004). On remand, defendant filed two motions to suppress evidence, arguing that the police improperly obtained statements that she made during two separate custodial interrogations because they (1) did not first inform her of her constitutional rights pursuant to the United States Supreme Court's holding in Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), and (2) used the "question first-warn later" technique repudiated by the Supreme Court in Missouri v. Seibert, 542 U.S. 600, 159 L. Ed. 2d 643, 124 S. Ct. 2601 (2004). In October 2005, the court granted defendant's

motions.

The State appeals, arguing that the trial court erred by granting defendant's motions to suppress evidence. We affirm.

I. BACKGROUND

In January 2001, the State charged defendant with first degree murder, alleging that she knowingly caused Joseph's death when she forcefully pressed his face and chest into her chest, causing him to suffocate, knowing her acts created a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West 2000)). Following a June 2001 trial, a jury convicted defendant of first degree murder and the trial court sentenced her as earlier stated.

In August 2004, this court reversed defendant's conviction and remanded the case for further proceedings. Specifically, this court concluded that the trial court erred by failing to provide the appropriate jury instruction regarding the mental state of knowledge in response to the jury's question regarding the difference between knowledge and intent. Griffin, 351 Ill. App. 3d at 855, 815 N.E.2d at 66.

In May 2005, defendant filed a motion to suppress evidence, arguing that the police improperly obtained statements she made during a custodial interrogation on January 24, 2001, because they did not first inform her of her Miranda rights. Later in May 2005, defendant filed a supplemental motion to

suppress evidence, arguing that (1) statements she made during a custodial interrogation on January 24, 2001, after being informed of her <u>Miranda</u> rights, should be suppressed because the interrogating officers used the "question first-warn later" technique repudiated by the Supreme Court in <u>Seibert</u>; and (2) statements she made on January 25, 2001, should be suppressed because the interrogating officers had not reinformed her of her <u>Miranda</u> rights.

At the hearing on her motions to suppress evidence, Bloomington police detective Clay Wheeler, a 14-year veteran, testified that on January 23, 2001, he interviewed defendant in a private waiting room in a Bloomington hospital. The tape-recorded interview lasted approximately 20 minutes and consisted of questions concerning the circumstances surrounding Joseph's injuries. Defendant willingly answered his questions. At the conclusion of the interview, Wheeler left and returned to his police station.

On January 24, 2001, Wheeler received notification that Joseph had died. At Joseph's autopsy, the forensic pathologist told Wheeler that Joseph's cause of death was nonaccidental asphyxia (suffocation). Specifically, Wheeler was informed that Joseph had been deprived of oxygen for at least four minutes. Wheeler then decided to reinterview defendant.

Wheeler went to defendant's home and asked her to

accompany him to the police station to answer questions regarding Joseph's death. Wheeler testified at the hearing that he wanted to question defendant at the station because (1) it was a controlled setting that would minimize outside interruption and (2) it would afford him the opportunity to videotape the questioning to ensure the details of their conversation were available and accurate. Defendant agreed but wanted her father, who was in her home at that time, to accompany her.

Wheeler transported defendant and her father to the station in an unmarked police car. Upon their arrival, Wheeler separated defendant from her father and ordered him to go to a public waiting room. Defendant asked Wheeler if her father could accompany her, but Wheeler refused to allow defendant's father to be present during her interrogation.

At approximately 4:30 p.m., defendant was placed in an interrogation room that had one small window located on the door's entrance. Wheeler told defendant that he was going to close the door for privacy but that if she needed anything, to let him know. Wheeler then closed the interrogation room door, which remained unlocked. However, Wheeler testified that defendant was not free to roam the police station despite Wheeler's statement to her that (1) she was not under arrest and (2) she was free to leave at any time.

A short time later, Wheeler and at least one other

detective began interrogating defendant. After interrogating her for approximately 2 hours and 10 minutes, defendant stated that she believed it was possible that she caused Joseph to stop breathing. Wheeler then informed defendant of her rights pursuant to the Supreme Court's holding in Miranda, 384 U.S. at 478-79, 16 L. Ed. 2d at 726, 86 S. Ct. at 1630. Defendant said that she understood her rights and waived them. Wheeler then immediately resumed interrogating defendant. At approximately 7:28 p.m., Wheeler concluded the interrogation and placed defendant under arrest.

The next day, defendant, who was then in custody in the McLean County jail, asked to speak with one of the detectives who had questioned her. When Wheeler and another detective arrived at the jail, defendant could not remember why she asked to speak with them. Instead of formally informing defendant of her Miranda rights, Wheeler reminded her that "she still had the rights [he] had [previously] explained to her and [that] she did not have to talk to [him]." Wheeler testified that defendant responded that she understood her rights and that "she did not mind talking to him." In response to Wheeler's questions, defendant (1) stated that what she had told Wheeler the previous day was true and (2) acknowledged that she had held Joseph close to her chest and squeezed him until he stopped breathing.

Defendant testified that when Wheeler transported her

and her father to the police station, she was not searched, handcuffed, or told that she was under arrest. Defendant testified that during the police station interrogation on January 24, 2001, she (1) was not told that she was free to leave at any time, (2) was asked the same questions that she had earlier answered, (3) did not think she could stop answering questions, (4) thought the interrogation room door was locked, and (5) believed she was under arrest. Defendant also testified that during the interrogation the next day at the jail, she could not recall (1) whether Wheeler had informed her about her Miranda rights or (2) what they spoke about.

Alvin A. House, a clinical psychologist, testified that defendant had an intelligence quotient of approximately 70, which fell within the borderline category of intellectual functioning. House opined that based on the various tests he administered, defendant had below-average mental abilities.

In addition to the testimony provided at defendant's hearing on her motion to suppress evidence, the parties stipulated to the admission of the videotaped interrogation conducted on January 24, 2001, and the accompanying transcript.

In October 2005, the trial court found that, with regard to the January 24, 2001, interrogation, defendant (1) knowingly and intelligently waived her Miranda rights, (2) was subjected to a custodial interrogation prior to being informed of

her <u>Miranda</u> rights, and (3) was subjected to an improper custodial interrogation in violation of <u>Seibert</u>, which negated defendant's <u>Miranda</u> waiver.  In addition, the court also found that defendant's statements on January 25, 2001, were inadmissible because she was not reinformed of her <u>Miranda</u> rights prior to being subjected to further police interrogation.  Therefore, the court entered an order suppressing defendant's statements made on January 24 and 25, 2001.

This appeal followed.

### II. THE STATE'S CLAIM THAT THE TRIAL COURT ERRED BY GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

The question before this court is whether defendant's statements in response to police questioning on January 24 and 25, 2001, should be suppressed.  The State argues that the trial court erred by granting defendant's motions to suppress evidence. Specifically, the State contends that because (1) defendant was not in custody prior to being informed of her <u>Miranda</u> rights and (2) defendant's postwarning statements were not obtained in violation of the Supreme Court's holding in <u>Seibert</u>, her January 24, 2001, statements are admissible.  The State also contends that officers were not required to reinform defendant of her <u>Miranda</u> rights on January 25, 2001, because there was no substantial probability that defendant's January 24, 2001, <u>Miranda</u> warnings were so stale and remote that defendant was unaware of her rights at the time of the January 25, 2001, interrogation.

Thus, the State asserts that defendant's January 25, 2001, statements are also admissible.  We address the State's contentions in turn.

## A. Standard of Review

In <u>People v. Slater</u>, 228 Ill. 2d 137, 149, 886 N.E.2d 986, 994 (2008), the Supreme Court of Illinois recently stated the applicable standard of review in determining the appropriateness of the trial court's ruling on a motion to suppress as follows:

> "In determining whether a trial court has properly ruled on a motion to suppress, findings of fact and credibility determinations made by the trial court are accorded great deference and will be reversed only if they are against the manifest weight of the evidence.  [Citations.]  We review <u>de</u> <u>novo</u>, however, the ultimate question posed by the legal challenge to the trial court's ruling on a suppression motion.  [Citation.] ***
> Where a defendant challenges the admissibility of a confession through a motion to suppress, the State bears the burden of proving the confession was voluntary by a preponderance of the evidence. [Citations.]"

B. Custodial Interrogation

### 1. The Definition of Custodial Interrogation

In Miranda, 384 U.S. at 478-79, 16 L. Ed. 2d at 726, 86 S. Ct. at 1630, the Supreme Court held the following:

"[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. ***  He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney[,] one will be appointed for him prior to any questioning if he so desires."

The Supreme Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  Miranda, 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612.  Thus, "'Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody."  It was that sort

of coercive environment to which <u>Miranda</u> by its terms was made applicable, and to which it is limited.'" (Emphasis omitted.) <u>People v. Hetzel</u>, 181 Ill. App. 3d 85, 92, 536 N.E.2d 909, 913 (1989), quoting <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719, 97 S. Ct. 711, 714 (1977).

### 2. <u>Factors</u> <u>That</u> <u>Determine</u> <u>Whether</u> <u>an</u> <u>Interrogation</u> <u>Is</u> <u>Custodial</u>

"The determination of whether a defendant is 'in custody' for <u>Miranda</u> purposes involves '[t]wo discrete inquiries ***: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" <u>People v. Braggs</u>, 209 Ill. 2d 492, 505-06, 810 N.E.2d 472, 481 (2003), quoting <u>Thompson v. Keohane</u>, 516 U.S. 99, 112, 133 L. Ed. 2d 383, 394, 116 S. Ct. 457, 465 (1995).

When examining the circumstances surrounding the interrogation, the supreme court has held that the following factors are relevant in determining whether a statement was made in a custodial setting:

"(1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indi-

- 10 -

cia of a formal arrest procedure, such as the
show of weapons or force, physical restraint,
booking[,] or fingerprinting; (5) the manner
by which the individual arrived at the place
of questioning; and (6) the age, intelli-
gence, and mental makeup of the accused."
Slater, 228 Ill. 2d at 150, 886 N.E.2d at
995.

"Regarding the reasonable-person portion of the custody
inquiry, 'the accepted test is what a reasonable person, innocent
of any crime, would have thought had he or she been in the
defendant's shoes.'" People v. Croom, 379 Ill. App. 3d 341, 349,
883 N.E.2d 681, 688 (2008), quoting Braggs, 209 Ill. 2d at 506,
810 N.E.2d at 482.

Although police officers conducting an interrogation
may tell a suspect that she is not under arrest and is therefore
free to leave at any time--as the State claims occurred here--a
suspect may still reasonably perceive that she was in custody.
People v. Gorman, 207 Ill. App. 3d 461, 475, 565 N.E.2d 1349,
1358 (1991).  Just as "no talismanic incantation [is] required to
satisfy [Miranda's] strictures" (California v. Prysock, 453 U.S.
355, 359, 69 L. Ed. 2d 696, 701, 101 S. Ct. 2806, 2809 (1981)),
an officer's statement to a suspect that she is free to leave at
any time--thus, implying that she is in control although she sits

- 11 -

in an interrogation room located inside the police station, staring at two imposing police officers who doubt her answers to their questions--similarly holds no magical qualities and may be rendered nugatory by the circumstances in which it was said. Indeed, any control the police exercised over the suspect has historically been viewed by courts as inconsistent with the contention that the police told her she was free to go. See Gorman, 207 Ill. App. 3d at 475, 565 N.E.2d at 1358 (mentioning cases where the court found suspects to be in custody during their interrogations because the police exercised control over them at the police station).

### 3. Factors That Some Courts Have Discussed in Determining Whether an Interrogation Is Custodial

Some courts have discussed the intent, knowledge, or focus of the police at the time of a suspect's interrogation as valid factors in determining whether the defendant was in custody for Miranda purposes. However, in People v. Goyer, 265 Ill. App. 3d 160, 166, 638 N.E.2d 390, 394 (1994), this court clarified "the very limited relevancy of a police officer's intent, knowledge, or focus" with regard to custodial interrogations. The officer's private thoughts are irrelevant because the officer's undisclosed knowledge, suspicion, intent, focus, subjective view, or thoughts can neither influence the suspect nor affect the coercive atmosphere of the interrogation. Goyer, 265 Ill. App. 3d at 167, 638 N.E.2d at 395.

In so clarifying, we reaffirmed our holding in Gorman that "if undisclosed, an officer's subjective thoughts and beliefs are irrelevant to the assessment whether the defendant is in custody." Goyer, 265 Ill. App. 3d at 167, 638 N.E.2d at 395. See Stansbury v. California, 511 U.S. 318, 323, 128 L. Ed. 2d 293, 298, 114 S. Ct. 1526, 1529 (1994) ("initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned"). Thus, "[t]he intent of police officers is relevant only to the extent that it may assist the trier of fact in determining whether the police, through their verbal and nonverbal conduct, created a coercive atmosphere requiring the Miranda warnings." Gorman, 207 Ill. App. 3d at 473, 565 N.E.2d at 1356.

We find support for reaffirming our holding in Gorman in the supreme court's recent decision in Slater, 228 Ill. 2d at 150,886 N.E.2d at 995, which omitted the intent, knowledge, or focus of the police at the time of a suspect's interrogation from the relevant factors the supreme court listed that determine whether a statement was made in a custodial setting. We do not view the supreme court's omission as inadvertent. Instead, we conclude the supreme court means what it said--namely that a police officer's focus on a suspect is not a relevant factor for Miranda purposes in determining whether a statement was made in a

custodial setting.

Nonetheless, we acknowledge the supreme court's even more recent decision in People v. Lopez, 229 Ill. 2d 322, 346, 892 N.E.2d 1047, 1061 (2008), where the court wrote the following:

> "In [People v.] Melock[, 149 Ill. 2d 423, 436-37, 599 N.E.2d 941, 946 (1992)], we considered several factors when determining whether a reasonable person would not have felt free to leave, such as: the intent of the officer; the understanding of the defendant; whether defendant was told he was free to leave or that he was under arrest; whether the defendant would have been restrained if he attempted to leave; the length of the interrogation; and whether Miranda warnings were given." (Emphasis added.)

Because the decision of the supreme court in Lopez contains no indication that it was disregarding what it said three months earlier in Slater about factors to be considered when determining whether a person was in custody, we will continue to follow its holding in Slater, which is more consistent with the teaching of the United States Supreme Court in Stansbury on this subject.

## 4. The Interrogation in This Case

The State first contends that because defendant was not in custody prior to being informed of her Miranda rights, her prewarning statements are admissible. We disagree.

In this case, the trial court made the following findings in determining that defendant was subjected to a custodial interrogation prior to being informed of her Miranda rights: (1) the officers transported defendant to the police station at (a) their request and (b) a date and time they chose; (2) the officers did not allow defendant's father to be present during the interrogation; (3) defendant was required to first ask for police assistance prior to engaging in an activity that required her to leave the interrogation room; (4) when the officers left defendant alone, they closed the interrogation room door; (5) the interrogation room was windowless (the court later amended its findings to reflect that a small window was located on the interrogation room door); (6) the officers situated themselves between defendant and the interrogation room door; (7) defendant was 20 years old, had below-average intelligence, and was inexperienced with the criminal justice system; (8) defendant was the focal point of the investigation; and (9) before informing defendant of her Miranda rights, the officers were openly skeptical of her answers and "exhorted, enticed, and cajoled her until they [received] the answers that they were seeking."

Our review of the record reveals that the trial court's findings are not against the manifest weight of the evidence. In so concluding, we note that the court considered the police officers' undisclosed knowledge and focus in determining whether defendant was in custody for Miranda purposes. Specifically, the court noted that defendant was the (1) focal point of the investigation because the officers were aware of the cause of Joseph's death and (2) only person with Joseph at the time of his death. For the reasons we mentioned earlier, the court should not have considered these factors. However, given that the court appropriately considered the other factors in finding defendant was subjected to a custodial interrogation prior to being informed of her Miranda rights, we adhere to our conclusion that the court's determination was not against the manifest weight of the evidence.

We find support for our conclusion by reviewing the circumstances at the police station. As earlier stated, the interrogating officers claimed that they told defendant she was free to leave the police station at any time. If this statement were in fact true, it meant that defendant had the maximum amount of control over the circumstances of her interrogation. After all, if she had the power to end the questioning whenever she wished and to simply walk away, then setting reasonable conditions short of walking away should also be in her power. How-

ever, defendant attempted to exercise that lesser control and was rebuffed--that is, she requested that her father be present during the interrogations and the officers declined her request. By doing so, the officers betrayed their earlier statement to her, implying that she was in charge, and sent a clear message that they were in control. Thus, their actions were inconsistent with their statement to defendant and support the trial court's finding that she was in custody.

## 5. Epilogue

### a. The Defendant's Burden of Production

As earlier stated, for the safeguards announced in Miranda to apply, the determination that a defendant was in custody requires an objective analysis of the circumstances surrounding the interrogation from the point of view of a reasonable person in the suspect's position, innocent of any crime. However, "[w]ithout affirmative evidence that the defendant believed he was in custody, the trial court need not consider what a reasonable person in the same position would have believed and can simply deny the motion to suppress." Goyer, 265 Ill. App. 3d at 164, 638 N.E.2d at 393.

In Goyer, 265 Ill. App. 3d at 165, 638 N.E.2d at 393, this court posed the following hypothetical to clarify the issue: would the trial court need to consider what a reasonable person

in the defendant's circumstances would believe if the defendant testified that he did not believe he was in custody, but rather, believed he was free to leave at any time?  In responding that the trial court would not, this court held that

> "when a defendant makes a motion to suppress
> his statements because he was in custody and
> not advised of his Miranda rights, before the
> trial court can conclude that defendant was
> in custody, it must first find that (1) de-
> fendant subjectively believed he was in cus-
> tody, and (2) a reasonable person in defen-
> dant's position, innocent of any crime, would
> also believe himself to be in custody.  [Ci-
> tation.]  Thus, a defendant bringing such a
> motion to suppress bears the burden of pro-
> duction to show that he subjectively believed
> himself to be in custody during the police
> questioning." Goyer, 265 Ill. App. 3d at
> 165, 638 N.E.2d at 393-94.

In many cases, this issue is not argued because a defendant typically testifies--as did defendant in this case--that she believed she was in custody.  Regardless, we reaffirm our holding in Goyer that a defendant who seeks to suppress his statements on the ground that he was in custody during the police

interrogation must first testify that he did in fact believe he was in custody during the interrogation.

### b. Police Station Interrogations

Initially, we note that the parties in this case did not argue--and correctly so--that Wheeler's interview of defendant conducted at the hospital on January 23, 2001, was a custodial interrogation. This may be because the coercive environment and restriction on defendant's freedom so important to a finding that she was in custody was totally absent in analyzing the circumstances surrounding that interview. However, the same is not true of the interrogation the police conducted the next day inside the police station.

Over 17 years ago, this court addressed the risks that police officers take in conducting what they claim to be non-custodial interrogations at a police station. In Gorman, 207 Ill. App. 3d at 470, 565 N.E.2d at 1355, this court stated that "[w]henever the police choose to conduct 'non[]custodial interrogations' at the police station, there is a substantial risk that a court subsequently will disagree that the circumstances were noncustodial." See People v. Wheeler, 281 Ill. App. 3d 447, 456, 667 N.E.2d 158, 164 (1996) (where the court recognized that when "police select a police station as the location for questioning a suspect, this setting naturally supports the argument that the suspect was subject to a custodial interrogation").

- 19 -

This risk arises because a defendant's inevitable claim--as in this case--that his statements were the result of a custodial interrogation, will become an issue for a court to resolve based on the factors previously discussed. Thus, "[t]he placement of furniture, the size of the room, the presence of armed officers, whether doors were opened or closed (and if closed, whether they were locked), the transport of the suspect into the depths of a building where ingress and egress is typically controlled by security measures," are all circumstances surrounding the interrogation that might give support to a defendant's claim that he did not believe he was free to leave. Gorman, 207 Ill. App. 3d at 471, 565 N.E.2d at 1355.

As we stated in Gorman, if interrogating officers truly desire to minimize this risk, they should create a noncustodial interrogation environment by conducting their interrogations outside of the police station, such as at "the local Burger King restaurant, a nearby park, the suspect's own residence, or in any location of the suspect's choosing." (Emphasis in original.) Gorman, 207 Ill. App. 3d at 471, 565 N.E.2d at 1355. Thus, we reemphasize that "'Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody."'" Gorman, 207 Ill. App. 3d at 470, 565 N.E.2d at 1354, quoting Mathiason, 429 U.S. at 495, 50 L. Ed. 2d at 719, 97 S. Ct. at 714. If the police wish to interrogate a suspect

without first informing him of his Miranda rights, they must ensure that they do not do so in a custodial setting.

C. Seibert and the "Question First-Warn Later" Technique

1. The Supreme Court's Decision in Seibert

In Seibert, 542 U.S. at 617, 159 L. Ed. 2d at 658, 124 S. Ct. at 2613 (plurality opinion of Souter, J., joined by Stevens, Ginsberg, and Breyer, JJ.), the Supreme Court held that a suspect's incriminating statements made after police had administered Miranda warnings were inadmissible because the officer's interrogation technique rendered the Miranda warnings ineffective. The statements at issue in Seibert had been obtained by the deliberate use of the "question first-warn later" technique--that is, where the interrogating officer strategically withholds Miranda warnings from a suspect until he makes incriminating statements and then, after obtaining a waiver of his Miranda rights, questions the suspect again by confronting him with his prewarning statements. Seibert, 542 U.S. at 604, 159 L. Ed. 2d at 650, 124 S. Ct. at 2605.

The Seibert plurality reasoned that the employment of this technique frustrated the intent of Miranda because "[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing[,] once the police began to lead him over the same ground

again." Seibert, 542 U.S. at 613, 159 L. Ed. 2d at 655-56, 124 S. Ct. at 2611.

Thus, to determine whether Miranda warnings delivered while in the midst of a custodial interrogation could effectively advise the suspect of his basic constitutional rights, the plurality advocated evaluating the (1) completeness and detail of the prewarning interrogation, (2) overlapping content of the two statements, (3) timing and setting of the first and the second interrogations, (4) continuity of police personnel, and (5) extent to which the interrogator's questions treated the second round of interrogation as continuous with the first. Seibert, 542 U.S. at 615, 159 L. Ed. 2d at 657, 124 S. Ct. at 2612.

Concurring in the judgment, Justice Kennedy narrowed the approach taken by the plurality opinion by stating that "[i]f the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." Seibert, 542 U.S. at 622, 159 L. Ed. 2d at 661, 124 S. Ct. at 2616 (Kennedy, J., concurring). Such "curative measures" could include "a substantial break in time and circumstances between the prewarning statement and the Miranda warning," or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." Seibert, 542 U.S. at 622, 159 L. Ed. 2d at

661, 124 S. Ct. at 2616 (Kennedy, J., concurring).

### 2. Application of Seibert to Defendant's Postwarning Statements

The State contends that defendant's postwarning statements on January 24, 2001, are admissible because they were not obtained in violation of the Supreme Court's holding in Seibert. We disagree.

In this case, the trial court found--as in Seibert-- that (1) the officers' questioning during the unwarned portion of the interrogation was systematic, exhaustive, and managed with psychological skill; (2) prior to being informed of her Miranda rights, little, if any, incriminating evidence was left unsaid by defendant; (3) the officers did not advise defendant that her prewarning statements could not be used against her; (4) the officers did not dispel the oddity of warning defendant that she had the right to remain silent and right to counsel after they led her through a systematic and exhaustive interrogation; (5) the postwarning questioning immediately followed the Miranda warnings; (6) the police officers' postwarning questions treated the postwarning portion of the interrogation as a continuation of the prewarning portion; (7) it was clear that the officer's strategy was meant to undermine defendant's Miranda warnings; and (8) defendant's Miranda warnings were invalidated by the officers' use of the "question first-warn later" technique.

Our review of the record reveals that the trial court

correctly assessed the time line, content, and context of defendant's custodial interrogation in determining the deliberateness of the officers' conduct.  Thus, given our standard of review, we conclude that the court's findings are not against the manifest weight of the evidence.

### D. The State's Claim That the Trial Court Erred by Suppressing Defendant's January 25, 2001, Statements

Last, the State contends that the officers were not required to reinform defendant of her Miranda rights on January 25, 2001.  Specifically, the State asserts that because there was no substantial probability that defendant's January 24, 2001, Miranda warnings were so stale and remote that defendant was unaware of her rights at the time of the January 25, 2001, interrogation, those warnings did not need to be repeated.  We disagree.

Here, the trial court found that because defendant's January 24, 2001, Miranda waiver was invalidated by the officers' deliberate use of the "question first-warn later" technique repudiated by the Supreme Court in Seibert, defendant was "deprived of the knowledge essential to making a free and rational choice" regarding a waiver of her Miranda rights on January 25, 2001.

Because we earlier concluded that the trial court's findings that defendant's January 24, 2001, Miranda waiver was invalidated was not against the manifest weight of the evidence,

we reject the State's claim.  In other words, given the court's findings that the <u>Miranda</u> warnings defendant received on January 24, 2001, were rendered nugatory because of the <u>Seibert</u> violation (which we affirm), this record no longer contains any valid <u>Miranda</u> warnings that the State may claim were still valid the next day.  Therefore, we need not address whether the officers would have been required to reinform defendant of her <u>Miranda</u> rights prior to her January 25, 2005, interrogation.

In closing, we commend the trial court for the care and consideration it took in this case.  Its findings demonstrated a clear understanding of the facts, which this court found to be especially helpful.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

APPLETON, P.J., and McCULLOUGH, J., concur.